**SIGNED this 11 day of October, 2013.**



_____
**John T. Laney, III**
**Chief United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO.: 12-70482 JTL |
| ALPHA PROTECTIVE | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Debtor. | ) | CHAPTER 7 |
| _____ | ) | |
| | ) | |
| ALPHA PROTECTIVE | ) | Adv. No. 12-07012 |
| SERVICES, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANK OF AMERICA, N.A. and | | |
| UNITED STATES OF AMERICA, | | |
| INTERNAL REVENUE SERVICE, | | |
| | | |
| Defendants. | | |

_____ )

)
)
BANK OF AMERICA, N.A.,                        )
)
    Cross-Claimant.                          )
)
        v.                                   )
)
UNITED STATES OF AMERICA,                     )
INTERNAL REVENUE SERVICE,                    )
)
    Cross-Defendant.                         )
_____ )


## Memorandum Opinion

This matter comes before the Court on a Motion for Summary Judgment filed by Cross Claimant Bank of America, N.A. (the "Bank") and a Motion for Partial Summary Judgment filed by Cross Claim Defendant Internal Revenue Service (the "IRS"). Both motions address a narrow issue regarding federal tax liens. Specifically, the issue is whether accounts receivable acquired by the debtor more than 45 days after the filing of a notice of tax lien on the debtor's property may be considered proceeds of contract rights acquired by the debtor prior to the expiration of that 45 day period, so as to give the security interest of a commercial creditor in the receivables priority over the tax lien, pursuant to 26 U.S.C. §§ 6323(a) and (c).   The Court heard oral arguments on the motions on August 26, 2013. At the conclusion of the hearing, the Court took the matter under advisement. For the reasons set forth below, the Court will grant the Bank's Motion for Summary Judgment and deny the IRS's Motion for Partial Summary Judgment

**Background**

This case arises out of a dispute between the Bank and the IRS regarding whose security interest has priority in regard to post petition payments made to the Debtor pursuant to certain pre-petition contracts entered into by the Debtor. The Debtor, Alpha Protective Services, Inc. ("Alpha"), was previously in the business of providing comprehensive security and protective services to the United States Government and private institutions.  On April 12, 2012, Alpha filed for protection under Chapter 11 of the Bankruptcy Code.   Subsequently, Alpha operated as a debtor in possession for approximately eight months, until the United States Trustee appointed a Chapter 11 Trustee to oversee the case. On December 20, 2012, this Court granted the Chapter 11 Trustee's motion to convert the case to a Chapter 7 liquidation case.

On July 3, 2012, while still operating as a debtor in possession, Alpha initiated this Adversary Proceeding by filing its Complaint to Determine Extent and Priority of Liens (the "Complaint"). The Complaint alleges that both the Bank and the IRS claim an interest in Cash Collateral. The Bank's claim is based on its alleged security interest in accounts receivable and contract payments and the IRS claims an interest in the same on the basis of certain tax liens filed against the Debtor's property. The Complaint asks the Court to determine the priority between Bank and the IRS. Both the Bank and IRS timely filed answers and cross-claims against each other, with each asserting rights to the collateral in question.

I.   The Contracts

Alpha's primary assets consisted of five contracts, and the rights to payment under those contracts, to provide security guard and protective services. The five

contracts were with Fort Bragg, the Environmental Protection Agency, the Department of Housing and Urban Development, McGuire Air Force Base, and Thomas University (collectively, the "Contracts"). Each of the contracts was subject to the exercise of an option to extend the contract beyond the base contract period and for subsequent periods after that. (*See* Statement of Material Facts in Support of Mot. for Partial Summ. J. by United States of America ¶¶42, 49, 53, 66 & 71).

II.    Bank's Security Interest

Prior to Alpha's financial troubles, the Bank served as Alpha's lender. In exchange for money loaned, Alpha granted the Bank a security interest in its assets, including inventory, equipment, accounts receivable, and contract rights. The Bank's claimed security interest in the Contracts is based on the following loans, notes, and security agreements (collectively, the "Loan Documents"): (1) a Revolving Credit Note for a line of credit in the maximum amount of $8,000,000; (2) a Term Note in the principal amount of $413,679.55; (3) a Loan Agreement; and (4) a Security Agreement giving the Bank a security interest in, among other things, all of Alpha's accounts receivable and contract rights. (Bank Mot. for Summ. J. at 2-3). The Bank perfected its interest by filing a UCC Financing Statement with the Clerk of the Superior Court of Thomas County, Georgia on May 17, 2011. Id. at 3. On May 29, 2012, the Bank filed a proof of claim, asserting a secured claim under the Loan Documents in the amount of $1,697,181.35. Id. at 5.

III.    The IRS's Tax Liens

During the course of its operation Alpha accumulated substantial federal employment tax liabilities. Accordingly, the IRS made tax assessments, and when Alpha failed to pay those liabilities the IRS filed Notices of Federal Tax Lien against Alpha. On October 19,

2011, the IRS filed a Notice of Federal Tax Lien for $1,682,709.35 for form 941 federal employment tax liabilities of Alpha in the Superior Court of Thomas County, Georgia. (IRS Mot. for Partial Summ. J. at 4). On December 21, 2011, the IRS filed another Notice of Federal Tax lien, this time for $398,733.91 for form 941 federal employment tax liabilities of Alpha in the Superior Court of Thomas County, Georgia. *Id.* The IRS claims an interest in Alpha's collateral by virtue of the above referenced tax liens. It is undisputed that the Tax liens were filed after the Bank perfected its security interest in Alpha's property.

The principal issue which this Court has been asked to decide is whether the payments received by Alpha under its contracts after the filing of the tax liens are accounts receivable or identifiable proceeds of contract rights.

## Conclusions of Law

### I.    Summary Judgment Standard

In dealing with motions for summary judgment, Federal Rule of Civil Procedure 56 is made applicable to adversary proceedings in bankruptcy cases by Federal Rules of Bankruptcy Procedure 7056. Pursuant to Rule 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). An issue is "material" if it affects the outcome of the case under the applicable law. *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.1996).

II.     Federal Tax Lien Act

When a corporation fails to pay its taxes after a demand has been made, the Federal Tax Lien Act (FTLA) grants the United States a lien "upon all property and rights to property, whether real or personal, belonging to such person." 26. U.S.C. § 6321, *Plymouth Savings Bank v. U.S.I.R.S.*, 187 F. 3d 203, 206 (5th Cir. 1999). In addition, the tax lien attaches to property acquired by the taxpayer after the imposition of the lien. *Plymouth Savings Bank*, 187 F. 3d at 206. The tax lien automatically attaches at the time of the IRS's assessment and continues until liability is satisfied or becomes unenforceable due to lapse of time. *Bremen Bank and Trust Co. v. U.S.*, 131 F. 3d 1259, 1263 (8th Cir. 1997). However, "[t]o be effective as against third parties, notice of the lien must be publicly filed pursuant to state recordation law." *Id.*

Although a properly filed tax lien will have priority over some security interests, "Section 6323 of the FTLA . . . gives certain commercial liens priority over federal tax liens." *Plymouth Savings Bank*, 187 F. 3d at 206. Section 6323(a) provides protection to a security interest that is "in existence" prior to the government's filing notice of the tax lien by giving priority to the prior lien. 26 U.S.C. § 6323(a); *Plymouth Savings Bank*, 187 F.3d at 206; *see also Bremen Bank and Trust Co.*, 131 F. 3d at 1263. While § 6323(a) applies to prior security interests, § 6323(c) extends the priority of these prior security interest to certain "qualified property" that the taxpayer acquires even after the government has filed a notice of the tax lien. *See Plymouth Savings Bank*, 187 F. 3d at 206. At issue here is the scope of the safe harbor provided by § 6323(a) and § 6323(c).

For after acquired property to fall within the § 6323(c) safe harbor, a security interest must be in " 'qualified property covered by the terms of a written agreement

entered into before tax lien filing,' including 'commercial transactions financing agreements[s].' " *Plymouth Savings Bank*, 187 F. 3d at 206 (quoting 26 U.S.C. § 6323(c)(1)(A)(i)). Additionally, the "security interest must also be superior, under local law, to a judgment lien arising out of an unsecured obligation." *Id.* The protection for a properly perfected security interest in "qualified property" also extends to the proceeds of that property. *In re National Financial Alternatives, Inc.* 96 B.R. 844, 852 (Bankr. N.D. Ill. 1989). The term "proceeds," "includes whatever is received when collateral is sold, exchanged, or collected." 26 C.F.R. § 302.6323(c)-1(d). Accordingly, if the Bank has a security interest in "qualified property," which was perfected under local law prior to forty-five days after the filing of the IRS's notice of tax lien, then the Bank's security interest in that property and the proceeds of that property will be superior to that of the IRS.

Under § 6323, the term " 'qualified property', when used with respect to a commercial transaction financing agreement, includes only commercial transaction financing security acquired by the taxpayer-debtor before the 46th day after the date of tax lien filing." 26 U.S.C. § 6323(c)(2)(B).   Section 6323(c)(2)(A)(i) defines a "commercial transaction financing agreement" as "an agreement (entered into by a person in the course of his trade or business) . . . to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business," *id.* at § 6323(c)(2)(A)(i), that has been entered into within 45 days of the date of the filing of the tax lien. *Id.* at § 6323(c)(2)(A).  For the purposes of § 6323 the term "commercial financing security" means "(i) paper of a kind ordinarily

arising in commercial transactions, (ii) accounts receivable, (iii) mortgages on real property, and (iv) inventory." *Id.* at 6323(c)(2)(C).

We next turn to the relevant Treasury regulations, which provide even further guidance as to what types of security interest are protected under § 6323(c). Under the pertinent treasury regulations, "paper of a kind ordinarily arising in commercial transactions" means "any written document customarily used in commercial transactions," and includes "paper giving contract rights." 26 C.F.R.§ 301.6323(c)-1(c)(iv). Under the FTLA, a "contract right" is "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." *Id.* at § 301.6323(c)-1(c)(2)(i). On the other hand, "an account receivable is any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." *Id.* at § 301.6323(c)-1(c)(2)(ii).

Because Alpha entered into the contracts in question prior to 45 days after the IRS filed notice of the tax lien, the principal issue is whether by entering into the contracts did Alpha "acquire" a "right to payment" under those contracts, and when did that property come into existence. If, by signing the contracts, Alpha acquired a right to payment under the contracts at the time the contracts were executed then the Bank's lien will trump the IRS's. If, however, Alpha did not acquire a right to payment under the contracts at that time, then the IRS's lien has priority.

The determination of when a debtor acquires its collateral is related to how that collateral is defined. *Bremen Bank and Trust Co*, 131 F. 3d at 1264. For example, a contract right is acquired "when the contract is made." 26 C.F.R. § 301.6323(c)-1(d); *Bremen Bank and Trust Co*, 131 F.3d at 1264. But, an account receivable is not acquired

until "the time, and to the extent a right to payment is earned by performance." *Id.* at §
301.6323(c)-1(d). An account receivable, however, can also be the proceeds of a contract
right. *Bremen Bank and Trust Co.*, 131 F. 3d at 1264; *see also In re National Fin.
Alternatives, Inc.*, 96 B.R. at 853. So, it follows that where the "collateral is a contract
giving contract rights, the proceeds of those rights, like the rights themselves, are
considered to have been acquired at the time the contract was made." *Plymouth Savings
Banks*, 187 F.3d at 208. This remains the case even though the right to the proceeds under
the contract does not become unconditional until the contract is performed. *Id*; *see also In
re National Fin. Alternatives, Inc.*, 96 B.R. at 852.

The IRS contends that Alpha did not acquire its accounts receivable for security
and protective guard services until it earned them by performance. (IRS Mot. for Partial
Summ. J. at 11). Instead, the IRS argues, none of Alpha's receivables were guaranteed
rights to payment not yet earned by performance and acquired at the time it entered into
the contracts. *Id*. Thus, the IRS continues, Alpha's rights in the proceeds of its service
contracts were not sufficiently definite to be deemed "acquired" prior to the filing of the
tax lien. *Id*. The IRS stresses that Alpha had no guaranteed right to be paid for services—
prior to performance—under any of the contracts. Alpha's right to payment under those
contracts could not be "in existence" until Alpha performed under the contract, which did
not occurred within 45 days after the filing of the notice of tax lien. Accordingly, the IRS
argues that because Alpha's right to payment under the contracts is an account receivable
that was not in existence within 45 days after the filing of the tax lien, the tax lien and the
Bank's security interest attach to the accounts receivable simultaneously. *Id*. The IRS
contends that, when simultaneous attachment occurs, the tax lien has priority over the

Bank's security interest. (IRS Mot. for Partial Summ. J. at 11 (citing *United States v. McDermott,* 507 U.S. 447 (1993)).

On the other hand, the Bank argues that Alpha acquired "contract rights" under the contracts, and that the Bank perfected its interest in those rights prior to the filing of the tax lien. (Bank Mot. for Summ. J. at 2). Thus, the Bank continues, the Bank's security interest in those contract rights and the proceeds generated from those rights is therefore superior to the tax lien. The IRS concedes that if the right to payment under the contracts arose at the time the agreements were executed, the proceeds are "contract rights" acquired before the tax lien arose, and that to the extent the Bank had a perfected security interest in Alpha's "contract rights" that were in existence before the filing of the federal tax lien, its security interest has priority over the federal tax lien. (IRS Mot. for Partial Summ. J. at 11).  But, the IRS maintains that Alpha did not acquire its accounts receivable under the contracts until it earned them by performance and that, where property subject to a prior perfected security interest comes into existence after the tax lien filing, the tax lien attaches first. (IRS Mot. for Partial Summ. J. at 8 (citing *United States v. McDermott,* 507 U.S. 447, 452 (1993)).

The Court is not persuaded by the IRS's characterization of the definition of "contract rights" in the federal regulation. Section 301.6323(c)-1(c)(2)(i) defines a contract right as "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." "This language indicates Congress's understanding that in the ordinary commercial context, actual payment under a contract is typically due only when it is earned by some performance, but contract rights may exist prior to that time." *Bremen Bank and Trust Co.*, 131 F. 3d at 1265.

Moreover, "[s]ection 301.6323(c)-1(c)(2)(i) explicitly recognizes that such contracts generate 'contract rights' from the outset even though performance has not yet occurred." *Id.* The Eight Circuit explained in *Bremen Bank and Trust Co.* that "[t]o hold otherwise would be to exclude most service contracts, thereby frustrating congressional intent to 'improve the status of private secured creditors and prevent impairment of commercial financing transactions by modernizing the relationship of Federal tax liens to the interest of other creditors.'" 131 F. 3d at 1265 (quoting *United States v. Kimbell Foods Inc.*, 440 U.S. 715, 738 (1979)). Thus, it makes no difference that payment was conditional upon performance. *Plymouth Savings Bank*, 187 F.3d at 208.

III.    Exercise of the option clauses.

The IRS also argues that even if the court were to determine that Alpha had acquired specific and enforceable contract rights to payment, those rights terminated upon the exercise of option clauses in the contracts which caused the contracts to be renewed with new performance obligations after the filing of the Tax lien. (IRS Mot. Partial. Summ. J. at 18) The IRS asserts that if the federal tax lien filing occurred before the option was exercised, the tax lien would attach to Alpha's right to payments once the exercise occurred and that therefore "contract rights" within the meaning of the Treasury Regulations would not come into existence until the option was exercised. *Id.* Under such a scenario, the Bank's security would be subordinate to the tax lien because the Bank would not be secured as to receivables that were "qualified property" under section 6323(c). *Id.* at 19.

The fact that the contracts were subject to option clauses, and that those clauses were exercised after the filing of the tax lien, does not change the analysis in regard to

when the "contract rights" came into existence. Contrary to the IRS's assertion "[t]he exercise of an option in an existing contract is not equivalent to the award of a new contract." C.M.P., Inc. v. U.S., 8 Cl. Ct. 743, 747 (1985). It merely provides for the continuation of a unitary contract package *Id*. The exercise of an option clause is considered a new contract "only when the option was the principal subject matter of the bargain, *i.e.,* an option contract." <u>Alliant Techsystems, Inc. v. United States</u>, 178 F.3d 1260, 1275 (Fed. Cir. 1999). In addition, "[this] rule has consistently been applied to government contracts." *Id. at 1276; See International Bus. Invs., Inc. v. United States,* 21 Cl.Ct. 79 (1990); *Ocean Tech., Inc. v. United States,* 19 Cl.Ct. 288, 291 (1990); *C.M.P., Inc.,* 8 Cl.Ct. at 746–47 (1985).

In this case, because the option clause was not the principal subject matter of the bargain, any rights or obligations created by the exercise of the options clauses are properly considered part of the original contract. Therefore, regardless of when the renewal options were exercised, the determinative date in regard to when the "contract rights" came into existences remains the date the original base contract was executed.

IV.    Alpha had a state law right to payment under the Contracts.

The IRS next contends that Alpha's rights in the proceeds of its service contracts were not sufficiently definite to be deemed "acquired" prior to the filing of the tax lien. Whether Alpha had a right to payment under the contracts is a question of state law. *Bremen Bank and Trust Co*. 131 F.3d at 1266. A contract right to payment is sufficiently certain when the parties have promised under a binding agreement to render goods or services in exchange for payment. *Id*. Thus, if Alpha entered into a valid contract then its right to payment was sufficiently definite to be deemed acquired prior to the filing of the

tax liens. Under Georgia law, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. Thus, to be enforceable, a contract must specify the parties, sufficiently describe the subject matter, and name the consideration. *See Lee v. Green Land Co. Inc.*, 245 Ga.App. 558, 560 (2000). Such an agreement would allow either party to bring suit for breach.

Here, although the contracts could be terminated upon 30 days notice, a binding enforceable contract existed whereby either party could sue the other for a failure to perform under the contracts. That is, if Alpha had failed to perform under the contracts Alpha would be subject to a breach of contract claim. Likewise, if a contracting party failed to pay Alpha for services performed under the terms of the contract Alpha would have a breach of contract claim against the offending party. Thus, although Alpha's right to payment was conditioned upon future performance, it is nevertheless a contract right. Since a contract right arises when the contract was made, Alpha's rights to payment under the contract arose prior to filing of the tax liens and therefore the Bank's prior perfected security interest in Alpha's contract rights has priority over the IRS tax liens.

V.     The Post-Petition Vehicles[1]

The Court finds that the Bank's lien as to the proceeds of the contracts is senior to the IRS's tax lien. Accordingly, the Court finds that because the Post-Petition Vehicles were purchased using the proceeds of the contracts, that the Bank has a senior priority as to the Post-Petition Vehicles. In addition, the Court finds that the Bank has a senior

---

[1] Alpha used approximately $70,000 in Cash-Collateral to purchase certain vehicles after the petition date. The parties and the Court refer to these vehicles collectively as the "Post-Petition Vehicles."

security interest in the Post-Petition Vehicles pursuant to a replacement lien granted to

the Bank under the Cash Collateral Orders.[2] The Cash Collateral Orders granted the Bank

a replacement lien "in all assets created or acquired by Debtor after the petition date . . .

to the same extent that a security interest in favor of Bank and/or IRS existed and was

valid prior to the Petition Date." Therefore, because the Bank had a senior interest in the

contracts prior to the petition date, the proceeds of which are Cash Collateral, the Bank

has a senior interest in the Post-Petition Vehicles that were acquired using the Cash

Collateral.

### Conclusion

The Court will grant the Bank's Motion for Summary Judgment and deny the

IRS's Motion for Partial Summary Judgment.  An order will be entered in accordance

with this Memorandum Opinion.

---

[2] The Debtor's use of Cash Collateral was permitted on a temporary basis subject to terms and conditions
of the Cash Collateral Orders entered on April 13, 2012 (the "First Interim Order"), April 23, 2012 (the
"Second Interim Order"), May 30, 2012 (the "Third Interim Order"), July 9, 2013 (the "Fourth Interim
Order"), August 9, 2012 (the Fifth Interim Order"), and October 18, 2012 (the "Sixth Interim Order")
(collectively, the "Cash Collateral Orders").